22-254
*Compass Productions v. Charter Comms*


# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of The United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 6th day of March, two thousand twenty-three.

PRESENT:
> GUIDO CALABRESI,
> GERARD E. LYNCH,
> BETH ROBINSON,
> > *Circuit Judges*.

―――――――――――――――――――――――――――

COMPASS PRODUCTIONS INTERNATIONAL LLC,

> *Plaintiff – Appellant,*

> v.                                                             No. 22-254

CHARTER COMMUNICATIONS, INC.,

> *Defendant – Appellee.*

―――――――――――――――――――――――――――

FOR APPELLANT:                                    JONATHAN E. NEUMAN, Law Offices of
                                                  Jonathan E. Neuman, Esq., Fresh
                                                  Meadows, NY.

FOR APPELLEE:                                     DEVIN S. ANDERSON (Judson Brown,
                                                  P.C., *on the brief)*, Kirkland & Ellis LLP,
                                                  Washington, D.C.

Appeal from a judgment of the United States District Court for the Southern District of New York (Marrero, *J.*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment entered on January 10, 2022 is **AFFIRMED.**

Compass Productions International, LLC ("Compass") appeals from the district court's summary judgment in favor of Charter Communications, Inc. ("Charter") on Compass's breach of contract and promissory estoppel claims. We assume the parties' familiarity with the underlying facts, procedural history, and arguments on appeal, to which we refer only as necessary to explain our decision.

Charter operates a cable service that contracts with television programmers to provide channels of video content to its customers. Compass owns television programming called The Jewish Channel ("TJC").

In May 2015, Charter announced its intent to merge with Time Warner Cable ("TWC"). After this announcement, Compass asked Howard Friedman ("Friedman"), the former President and Chairman of the American Israel Public Affairs Committee, to help pressure Charter into carrying TJC once its merger with TWC closed. Friedman eventually spoke with Waldo McMillan ("McMillan"), Charter's head of Government Affairs, who promised Friedman he would put Compass in touch with a senior executive at Charter if Friedman promised "not to go to the FCC because that would mess up the merger." Jt. App'x 104. McMillan accordingly arranged a call between Compass's CEO, Elie Singer ("Elie") and Charter's head of programming, Allan Singer ("Allan").

On December 21, 2015, Elie and Allan spoke over the phone about a potential carriage agreement between Compass and Charter. The specifics of their discussion are disputed, but Elie testified that he and Allan discussed a carriage agreement whereby Charter would carry TJC on the "Silver tier" and would pay Compass $0.05 per subscriber per month. With respect to timing, Elie testified that Allan told him that "30 days would not be possible and 60 days would not be possible and 90 days would be unlikely" because Charter would be very busy in the first few months following the merger. Jt. App'x 36.

The next day, Elie sent an email to Allan stating, "I'm sending a rate card we discussed that reflects the point we touched on during our call." Jt. App'x 198. He attached a document titled, "The Jewish Channel Programmer Proposal to Charter Communications." *Id.* at 198-99. Among other things, the document listed a contract term of five years and provided that Charter would carry "Programmer's" programming on its "Silver" tier, with "approximately 8 million subscribers on the launch date." *Id* at 199. With respect to launch timing, it stated that Charter would launch TJC "no later than 120 days after the closing of Charter's merger with Time Warner Cable." *Id*. The document did not include a description of the programming to be offered by TJC or the number of hours of programming TJC would be required to make available.

Later that day, Allan forwarded Elie's email and rate card to an internal group of Charter employees. Allan's email summary of the proposal included the following statements:

- "Proposed agreement is not conditioned on close, assumes obligations we cannot accept unless the transaction is approved and closes;
- Rate seems higher, he indicated a nickel but maybe to get there;
- No MFN protection [Elie] indicated he'd provide;
- We can't say that Silver will have 8M subs if transaction closes . . .
- I told [Elie] 120 days to launch would not be realistic post-close, asked for a year post-close to do this but suggested perhaps say commercially reasonable efforts when [Charter] rebrand[s], no later than 6 months,

4

(he did not like either apparently)."

Jt. App'x 202. On December 23, Allan responded to Elie's email, stating "I received this [rate card] and your voice mail message today. To clarify, I believe you understand it does not actually reflect all the points we discussed, but thank you very much nonetheless." 1:18-cv-12296, ECF No. 98, Response in Opposition to Motion for Summary Judgment, ¶ 91 [hereinafter Response].

On December 24, 2015, Elie responded via email, "I really tried to draft the document to incorporate the main points of our conversation, and I thought I did." *Id*. ¶ 92. Elie also stated that he could "only think of two things" that Allan meant were not reflective of the conversation—the lack of an MFN clause and the "timing" of the launch of TJC. *Id*. ¶ 93. In terms of the MFN, Elie wrote that it "would be something you'd put in a contract rather than a rate card." *Id*. ¶ 94. And in terms of the launch timing, Elie said he believed he addressed the timing by proposing "120 [days] because [Allan] said 60 and 90 days weren't possible." *Id*. ¶ 95. Allan never responded to Elie's December 24 email.

The FCC approved the merger between Charter and TWC on May 10, 2016, and the merger closed about a week later. Charter decided not to carry TJC, and Compass sued.

The district court granted Charter summary judgment on Compass's breach of contract claim, concluding that even viewing the record in the light most favorable to Compass, there was no evidence of a meeting of the minds as to an essential term of a valid carriage agreement—a launch date. The district court likewise rejected Compass's claim based on promissory estoppel because it found no evidence that Charter promised to carry Compass's channel if Compass refrained from advocating to the FCC regarding the proposed Charter-TWC merger.

We review a district court's grant of summary judgment without deference, construing the evidence in the light most favorable to the nonmoving party and drawing all inferences and resolving all ambiguities in favor of that party. *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 140 (2d Cir. 2008). Summary judgment is appropriate where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012).

## I.     Breach of Contract

The parties do not dispute that New York contract law applies to this action. Under New York law, Compass must establish there was a meeting of the minds on all essential terms of the contract, demonstrating the parties' mutual assent and mutual intent to be bound. *Schurr v. Austin Galleries of Ill., Inc.*, 719 F.2d 571, 576 (2d Cir. 1983).

Both parties agree that a carriage agreement's essential terms include the launch timing of programming, content of programming, and the parameters for calculating license fees. Compass does not contend that the parties agreed to a specific launch date, but argues that Allan agreed that the TJC programming would be launched within three to six months after Charter's merger with TWC.

We agree with the district court that, even viewed in the light most favorable to Compass, the record does not support Compass's contention that the parties agreed to launch the TJC programming within a specified time frame.[1]

---

[1] Because we conclude that Compass has not mustered sufficient evidence to show that the parties agreed to the essential terms of a contract, we need not address Charter's statute of frauds argument.

Compass largely relies on Allan's December 22 internal email as evidence that he agreed to launch TJC within three to six months of the merger. In particular, Compass points to Allan's statement that he:

> told [Elie] 120 days to launch would not [be] realistic post-close, asked for a year post-close to do this but suggested perhaps say commercially reasonable efforts when [Charter] rebrand[s], no later than 6 months, ([Elie] did not like either apparently).

Jt. App'x 202. But a jury could not from this email infer that Allan *agreed* that Charter would launch TJC within six months of the merger. This same email refers to the rate card as "The Jewish Channel *proposal*," and identifies various problems with the "[p]roposed agreement." Jt. App'x 202 (emphasis added). Its language reflects that negotiation of rates was still underway. *Id*. ("[Elie] indicated a nickel but maybe get there"). And with reference to timing, Allan reported that he "*suggested* . . . commercially reasonable efforts when we rebrand, no later than 6 months." *Id*. (emphasis added). A reasonable jury could not infer based on this evidence that Allan *agreed* to launch TJC no later than six months from the merger.

Elie's own testimony doesn't save Compass's claim. Nowhere does Elie testify that he and Allan agreed to a launch time of no more than six months after the merger closed. In the December 22 proposal to Allan following their

December 21 conversation, Elie indicated that launch would occur 120 days from the merger. When asked in his deposition whether they had in their December 21 conversation discussed the 120-day launch time, Elie testified "I don't recall specifically whether we talked about 120 days." Jt. App'x 386. Instead, Elie explains that because Allan said "30, 60, and 90 would be very difficult," but he *didn't* say "30, 60, 90, 120 were no good," Elie wrote 120 days on the rate card he sent to Allan the next day. *Id*. And when Allan did not specifically object to the timing on the rate card, Elie took that to constitute acceptance. *Id*.

But Allan did respond to Allan's December 22 communication. In his December 23 email to Elie, Allan told Elie, "I believe you understand [the rate card] does not actually reflect all the points we discussed." Response ¶ 91. Even with the benefit of inferences, no reasonable jury could draw the conclusion that by failing to respond further to Elie, Allan agreed to a 120-day launch window. And, as noted, Elie did not himself testify about any agreement to launch within six months.[2]

---

[2] At oral argument, Compass's counsel argued for the first time that unspecified allegations in its complaint, verified by Elie, constitute evidence for purposes of our summary judgment assessment. The allegations from the Complaint Compass cited in connection with Charter's summary judgment motion do not relate to the discussion between Elie and Allan, and do nothing to create a dispute of material fact.

## II.     Promissory Estoppel

Under New York law, a claim for promissory estoppel requires "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance." *Cyberchron Corp. v. Calldata Systems Development, Inc.*, 47 F.3d 39, 44 (2d Cir. 1995). Because Compass fails to point to any clear and unambiguous promise made by Charter that it would carry TJC, its promissory estoppel claim fails. *See Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 265 (2d Cir. 1984) (finding no clear and unambiguous promise made by defendants to the effect that a deal had been made).

Although Elie testified in his deposition that during his call with Allan, he agreed, "in a manner of speaking," that going forward Compass would not go to the FCC, Jt. App'x 392-93, despite repeated questions on the subject, he did not testify that he made such a promise because Allan promised to carry TJC. Instead, he indicated that because Allan "softened" during the discussion of a carriage deal, after an initially truculent opening to the conversation, Elie concluded that an implicit term of any carriage deal would be that Compass not get in the way of the merger. *Id.* at 393. Nor does Compass offer other evidence sufficient to warrant a jury's finding that Allan promised carriage during that

10

conversation.  To the contrary, Compass's continued efforts to secure a

commitment from Charter belies Compass's argument that Charter promised

carriage.  *See, e.g.*, Jt. App'x 208 (Elie emailed Friedman, well after the December

21 call, that "I just wish we could turn up the volume on Charter again.  I feel like

we're so close to getting a commitment from them.").  Thus, the evidence is

insufficient to show a "clear and unambiguous promise" to carry TJC.[3]

* * *

We have considered Compass's remaining arguments and conclude that

they are without merit.  The district court's judgment is **AFFIRMED**.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

---

[3] Compass's alternative suggestion that the promise supporting its estoppel claim was made by McMillan to Friedman is likewise unavailing.  It is undisputed that McMillian and Friedman never discussed an actual carriage agreement, and the only evidence of any promise in exchange for Compass's forbearance was McMillan's promise to put Compass in touch with a Charter executive.  **Error! Main Document Only.**That promise was fulfilled when Allan and Elie had their December 21 conversation.

11